UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JEFFREY GIBBS and CHAD QUINLIN,                              Plaintiffs,

v.                                              Civil Action No. 3:14-cv-587-DJH

NORFOLK SOUTHERN RAILWAY
COMPANY,                                                      Defendant.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

This action was brought under the whistleblower provision of the Federal Railroad Safety Act (FRSA). Defendant Norfolk Southern Railway Company answered the complaint as to Plaintiff Jeffrey Gibbs (Docket No. 9) but has moved to dismiss the claims of Plaintiff Chad Quinlin, arguing that Quinlin cannot prevail on his claim of retaliation because he did not engage in an activity protected under the Act. (D.N. 10) Also before the Court is the plaintiffs' objection to Magistrate Judge Dave Whalin's order denying their motion for leave to amend the complaint. (D.N. 32; *see* D.N. 31) Because the complaint fails to state a plausible claim for relief by Quinlin and his attempted amendment was futile, the motion to dismiss will be granted and the objection will be overruled as to Quinlin. The objection will be sustained with respect to Gibbs, as Norfolk Southern did not oppose Gibbs's amendment of the complaint.

I.   BACKGROUND

Gibbs and Quinlin are former employees of Norfolk Southern. As set forth in the complaint, they and their coworkers were informed by Norfolk Southern Senior General Foreman Sherrill Jones that Norfolk Southern's "private management entertainment train" (the "Derby Train") would interfere with employee parking around the time of the 2012 Kentucky Derby. (D.N. 1 at PageID # 2 ¶¶ 8-10) The only other access to the rail yard was blocked by

1

municipal utility work at the time, and thus "[a]ll of the workers, including Plaintiffs, were alarmed" when they learned of the parking change "because it would require them to park in a dangerous neighborhood and walk up the N[orfolk] S[outhern] mainline to get to the yard to work." (*Id.* at PageID # 3 ¶ 12) The complaint further alleges that "Gibbs and others voiced all of the workers' safety concerns to local management, including Jones," who informed them that "nothing could be done about it." (*Id.* ¶¶ 13-14) Gibbs replied that when the Derby Train arrived, he would tell Norfolk Southern Chief Operating Officer Wick Moorman about the workers' concerns. (*Id.* ¶ 15) Jones warned Gibbs not to approach Moorman, stating that Gibbs "would be arrested and the only person he would be able [to] tell his story to would be 'the judge.'" (*Id.* ¶ 16) Gibbs then sent an e-mail to Moorman "on behalf of all of the workers, complaining about th[e] situation and the dangers it created." (*Id.* ¶ 17) Ultimately, following "an uproar" among Norfolk Southern management (*id.* ¶ 18), "local management was ordered to provide safe access to the yard," and the employees were able to use an alternate route while the Derby Train was in town. (*Id.* at PageID # 4 ¶ 20)

Approximately two months later, Gibbs and Quinlin were away from company property in a company truck after completing their assigned tasks. (*Id.* at PageID # 4 ¶¶ 21-24) They were discovered by Norfolk Southern management and subsequently suspended from work based on accusations of sleeping on the job and being off company property. (*Id.* ¶¶ 24-27) On October 1, 2012, after a hearing, their employment was terminated. (*Id.* at PageID # 5 ¶¶ 28-29) They pursued administrative remedies before filing this lawsuit on August 22, 2014. (*See id.* at PageID # 6 ¶¶ 34-38)

Gibbs and Quinlin asserted one count of retaliation under FRSA, alleging that they were suspended and fired in retaliation for reporting a safety concern. (*See id.* at PageID # 6-7 ¶¶ 40-

45) Norfolk Southern sought dismissal of Quinlin's claim on the ground that Quinlin had failed to allege that he engaged in any activity protected by FRSA. (D.N. 10) With their response to the motion to dismiss, the plaintiffs filed a motion for leave to amend their complaint to address the deficiencies identified by Norfolk Southern. (D.N. 18, 19) That motion was denied by Magistrate Judge Whalin, who concluded that the proposed amended complaint could not survive a motion to dismiss Quinlin's claim and that amendment was therefore futile.[1] (D.N. 31) The plaintiffs timely objected to Judge Whalin's ruling pursuant to Rule 72 of the Federal Rules of Civil Procedure. (D.N. 32) They assert that a magistrate judge lacks authority to deny leave to amend for futility, and they urge the Court to undertake de novo review of the proposed amended complaint. (*See id.* at PageID # 179-80, 182-83)

Although the plaintiffs cite no case law on this point, the Court notes that there is a split of opinion as to whether denial of amendment on futility grounds is a dispositive matter (thus subjecting a magistrate judge's decision to de novo review) or nondispositive (reviewed only for clear error). *See* Fed. R. Civ. P. 72. *Compare Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 595 (7th Cir. 2006) ("The district judge correctly held that the magistrate judge's denial of Hall's motion to amend his complaint was nondispositive, subject only to review for clear error."), *with Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc.*, 280 F. Supp. 2d 184, 198 (S.D.N.Y. 2003) ("A ruling denying a motion for leave to amend for failure to state a claim under Fed. R. Civ. P. 12(b)(6) . . . is deemed dispositive and reviewed *de novo* under Rule 72(b)."). The Sixth Circuit

---

[1] The magistrate judge's decision did not discuss whether amendment by Gibbs—which was unopposed—would be appropriate. (*See* D.N. 21 at PageID #135 n.1 ("Norfolk Southern does not oppose Plaintiff Gibbs' motion for leave to file an amended complaint containing the additional allegations set forth in Plaintiffs' proposed amended complaint."))

does not appear to have spoken directly on the matter.[2] The Court finds no need to resolve this standard-of-review issue here, because the outcome would be the same under either standard: the proposed amended complaint, like the original complaint, clearly fails to state a claim upon which relief may be granted.

**II.    ANALYSIS**

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this plausibility standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It is factual allegations that are essential; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the Court need not accept such statements as true. *Id.* A complaint whose "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" does not satisfy the pleading requirements of Rule 8 and will not withstand a motion to dismiss. *Id.* at 679. And where a proposed amended complaint could not survive a motion to dismiss, amendment is futile and need not be allowed. *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 355 (6th Cir. 2014) (citing *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010)).

---

[2] In one case, the court cited Rule 72(a), which governs objections to magistrate judges' rulings on nondispositive matters, in concluding that the plaintiff had waived her right to challenge the denial of her motion for leave to amend on the basis of futility. *See Scott v. Eastman Chemical Co.*, 275 F. App'x 466, 483-84 (6th Cir. 2008).

4

With these principles in mind, the Court turns to the complaints. Quinlin contends that he has stated a plausible claim for relief under either of two theories: direct retaliation or associational retaliation.

### A.     Direct Retaliation

Quinlin's claim is based on 49 U.S.C. § 20109(b)(1)(A), which provides that "[a] railroad carrier . . . shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition." Protected activity—i.e., reporting a safety or security condition—is an essential element of this claim. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 788-89 (8th Cir. 2014) (citing 49 U.S.C. § 42121(b)(2)(B)(i); 29 C.F.R. § 1982.104(e)(2)). Norfolk Southern contends that Quinlin's claim fails because he has not adequately alleged that he engaged in protected activity.

Quinlin concedes that he did not personally report any safety concern. (D.N. 19 at PageID # 100) Nonetheless, he maintains that his retaliation claim is viable because Gibbs's complaints were made on behalf of all the employees, including Quinlin. According to Quinlin, the term "reporting" in § 20109(b)(1)(A) encompasses reports made by another person on an employee's behalf. (*See* D.N. 19 at PageID # 101-104)

The Court need not decide whether FRSA's protection extends to indirect reports, however, because Quinlin has not alleged facts to support his assertion that he indirectly reported a safety condition. The complaint does not explain how Gibbs became the authorized spokesperson for Quinlin and the rest of the workers. Nowhere does it suggest that Quinlin discussed the alleged safety condition with Gibbs before Gibbs complained, or that Quinlin even knew Gibbs was going to make the complaints.

5

Though Quinlin points to various allegations that he believes show he engaged in protected activity, the paragraphs he cites contain only conclusory statements that Gibbs complained on behalf of all employees. (*See id.* at PageID # 100) For example, paragraph 13 of the complaint makes the bare assertion that "Gibbs and others voiced all of the workers' safety concerns to local management."[3] (D.N. 1 at PageID # 3 ¶ 13) Likewise, paragraph 17 alleges that "Gibbs sent an email to Moorman on behalf of all of the workers, complaining about th[e] situation." (*Id.* ¶ 17) The proposed amended complaint adds nothing of substance on this element, merely offering conclusory assertions such as "all of the safety complaints made by Plaintiff Gibbs were made on behalf of all of the workers who suffered this safety plight, including Plaintiff Quinlin." (D.N. 18-2 at PageID # 89 ¶ 20.1; *see also id.* at PageID # 90 ¶ 33.2 (alleging that Norfolk Southern "imposed such abnormally stringent adverse actions on Plaintiff Quinlin" in part "because he was one of the employees whose safety complaints were made through Plaintiff Gibbs")) Without factual support, such statements are entitled to no weight. *See Iqbal*, 556 U.S. at 678-79.

Quinlin argues that the e-mail Gibbs sent to Moorman shows that "Gibbs was making this safety complaint on behalf of all affected workers, and not just himself."[4] (D.N. 19 at PageID # 101) The e-mail, however, did not state that Gibbs was representing his coworkers. More significantly, it made no mention of any safety concern. The e-mail states, in its entirety:

> Dear Wick, I am a carman in Louisville, KY. The main entrance that we all use has a water main break and the entrance is blocked off. We are now

---

[3] Quinlin acknowledges that he "was not one of the 'others' that personally verbalized . . . safety concerns with Gibbs to Jones." (D.N. 19 at PageID # 100 n.8)
[4] Norfolk Southern attached the e-mail as an exhibit to its motion to dismiss. (*See* D.N. 10-2) The Court may consider documents attached to a motion to dismiss where, as here, the documents "'are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim.'" *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596 (6th Cir. 2013) (alteration in original) (quoting *Weiner v. Klais & Co.*, 108 F.3d 86, 88-89 (6th Cir. 1997)).

6

> entering from the other entrance by the control tower and driving through the D-yard area. As you know, this area is blocked off when the Derby train is here. They are telling us that we will have to park away from work and walk in. I said I would walk over to talk to you about it when you got here and show you why we can not enter from the regular entrance and I was told I would be arrested. This came from the senior general foreman here in Louisville. Could you please give me your thoughts on this issue. It is an inconvenience.

(D.N. 10-2) Nothing in the e-mail indicates that Gibbs and his coworkers were concerned about their safety; the parking situation is described as merely "an inconvenience." (*Id.*) The e-mail thus does not support Quinlin's allegation that he reported a safety condition through Gibbs.

Furthermore, the complaint did not contain even a conclusory allegation that Norfolk Southern had knowledge of any protected activity by Quinlin—another essential element of the retaliation claim. *See Kuduk*, 768 F.3d at 789. Again, the proposed amended complaint did little to remedy the original complaint's shortcomings, alleging without elaboration that Norfolk Southern "knew that Plaintiff Gibbs was making these safety complaints on behalf of all of the workers who suffered this safety plight, including Plaintiff Quinlin." (D.N. 18-2 at PageID # 89 ¶ 20.2) Such "'naked assertion[s]' devoid of 'further factual enhancement'" will not carry a complaint past a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). In short, Quinlin has failed, in either complaint, to "plead[] factual content that allows the [C]ourt to draw the reasonable inference" that Norfolk Southern is liable for direct retaliation under FRSA. *Id.* He thus fails to state a plausible claim for relief on this theory.

      **B.**    **Associational Retaliation**

In the alternative, Quinlin argues that he has suffered "associational retaliation," a theory of recovery recognized by the Supreme Court in *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011). *Thompson* involved a claim of retaliation under Title VII of the Civil Rights

Act. The plaintiff (Thompson) and his fiancée worked for the same employer. Three weeks after their employer learned that Thompson's fiancée had filed a sex-discrimination charge with the EEOC, Thompson was fired. He sued the employer, alleging that he was terminated in retaliation for his fiancée's protected activity. *See id.* at 172. Noting that "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination,'" the Supreme Court agreed that the employer's action was unlawful. *Id.* at 174 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Court found it "obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id.* While the Court "decline[d] to identify a fixed class of relationships for which third-party reprisals are unlawful," it did anticipate some boundaries: "firing a close family member will almost always" qualify, and "inflicting a milder reprisal on a mere acquaintance will almost never do so." *Id.* at 175.

As to whether Thompson had a cause of action under Title VII, the Court determined that he was "a person claiming to be aggrieved" within the meaning of the statute, and thus had standing to sue, because he fell within the zone of interests sought to be protected by Title VII. *See id.* at 178. In reaching this conclusion, the Court found it significant that Thompson was "not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's intended means of harming [his fiancée]. Hurting him was the unlawful act by which the employer punished her." *Id.*

Quinlin's reliance on *Thompson* is misguided for several reasons. First and foremost, neither complaint alleges associational retaliation. Rather, the retaliation claim asserts that both plaintiffs "reported a safety concern" to Norfolk Southern and were fired in direct retaliation for

8

their protected activity. (D.N. 1 at PageID # 6-7 ¶¶ 42-44; D.N. 18-1 at PageID # 91 ¶¶ 42-44) Apart from a vague assertion that "[t]he adverse actions of N[orfolk] S[outhern] . . . were primarily intended as retaliation against Plaintiff Gibbs," the plaintiffs do not suggest that Quinlin was fired for the purpose of harming Gibbs. (D.N. 18-1 at PageID # 90 ¶ 33.1)

More importantly, Gibbs and Quinlin offer no facts to suggest that the relationship between them was such that Norfolk Southern would have sought to punish one by firing the other. Quinlin is described not as a friend or family member of Gibbs, but merely one of a number of coworkers for whom Gibbs allegedly spoke. *Cf. Thompson*, 562 U.S. at 174, 178. Indeed, the proposed amended complaint indicated that Quinlin's termination was precisely the sort of "collateral damage" that Thompson's firing was not:

> NS and its management officers imposed such abnormally stringent adverse actions on Plaintiff Quinlin not only because he was one of the employees whose safety complaints were made through Plaintiff Gibbs, but also because giving him lesser discipline would have put a spotlight on their primary retaliatory animus against Plaintiff Gibbs. In other words, this was NS's and its management officers' opportunity to take down the leader of the dissent, and it mattered not to them that they were taking down a 'foot soldier' as well.

(D.N. 18-1 at PageID # 90 ¶ 33.2)

Moreover, the outcome of *Thompson* turned on the specific language of the Title VII antiretaliation provision, which is broader than the FRSA provision upon which Quinlin's claim is based. The person retaliated against in that case was not Thompson, but his fiancée. *See* 562 U.S. at 178. Because Thompson was "aggrieved by" the retaliation, however, he was permitted to sue. Unlike Title VII, which provides a cause of action to "a person claiming to be aggrieved . . . by the alleged unlawful employment practice," 42 U.S.C. § 2000e-5(f)(1), FRSA authorizes an enforcement action only by "[a]n employee who alleges discharge, discipline, or other discrimination" in violation of the Act. 49 U.S.C. § 20109(d)(1). The *Thompson* Court

9

noted that if Congress had intended "person aggrieved" to mean only "the employee who engaged in the protected activity," it would have used the phrase "'person claiming to have been discriminated against' rather than 'person claiming to be aggrieved.'" 562 U.S. at 177. FRSA's antiretaliation provision is much closer to the language suggested by the *Thompson* Court than the broad wording of Title VII.

Quinlin strains to convince the Court otherwise by pointing out that the procedural rules of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), which govern procedure in FRSA enforcement actions, refer to the presumed plaintiff as "a person" rather than "an employee." (*See* D.N. 19 at PageID # 13-14) AIR 21 provides for the filing of a complaint by "[a] person who believes that he or she has been discharged or otherwise discriminated against by any person in violation of subsection (a)." 49 U.S.C. § 42121(b)(1). As Quinlin points out, the reference to "subsection (a)" in AIR 21 makes little sense if applied to a FRSA claim. (*See* D.N. 19 at PageID # 13-14) This does not mean that the Court should engage in contortions to import the language to FRSA (as Quinlin suggests), particularly since FRSA itself contains similar language: section 20109(d), which is the basis for the present lawsuit, provides that an enforcement action may be brought by "[a]n employee who alleges discharge, discipline, or other discrimination in violation of subsection (a), (b), or (c) of [§ 20109]." 49 U.S.C. § 20109(d)(1); *see* § 20109(d)(3) (authorizing action in federal district court). And subsections (a), (b), and (c) of § 20109 refer to retaliation against "an employee," not "a person." *See, e.g.*, § 20109(a) (providing that "[a] railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee" for engaging in protected activity).

In any event, the relevant distinction is not whether Quinlin is a "person" or an "employee," but whether he is the individual who has suffered retaliation. After *Thompson*, a person other than the employee retaliated against may sue under Title VII if he or she is "aggrieved by" that retaliation. By contrast, FRSA authorizes an enforcement action by the individual against whom an employer has retaliated, not a third party. *See* 49 U.S.C. § 20109(d).

Quinlin insists that he has presented an even stronger case of associational retaliation than the *Thompson* plaintiff because unlike Thompson, he engaged in protected activity and suffered retaliation as a result. (D.N. 19 at PageID # 110-111) But if Quinlin could state a claim of direct retaliation, he wouldn't need *Thompson*. He simply has not alleged a viable claim under either theory.

## III.  CONCLUSION

Quinlin has not stated a plausible claim of direct retaliation under FRSA. Nor has he demonstrated that associational retaliation applies in this case. The proposed amended complaint did not cure these deficiencies. However, the magistrate judge apparently overlooked Norfolk Southern's consent to amendment by Gibbs. Accordingly, it is hereby

**ORDERED** as follows:

(1) Plaintiffs' Objection to the Decision of the Magistrate Judge (D.N. 32) is **OVERRULED** with respect to Plaintiff Chad Quinlin. As to Plaintiff Jeffrey Gibbs, the objection is **SUSTAINED** and the ruling of the magistrate judge (D.N. 31) is **SET ASIDE**. The Clerk of the Court is **DIRECTED** to file the First Amended Complaint (D.N. 18-1) in the record of this action.

(2) Norfolk Southern Railway Company's Motion to Dismiss the Complaint and all Claims of Plaintiff Chad Quinlin (D.N. 10) is **GRANTED**. The claims of Plaintiff Chad Quinlin are **DISMISSED** with prejudice.