UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JEFFREY GIBBS,                                                                          Plaintiff,

v.                                                          Civil Action No. 3:14-cv-587-DJH-DW

NORFOLK SOUTHERN RAILWAY
COMPANY,                                                                              Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey Gibbs worked for Defendant Norfolk Southern Railway Company in Louisville, Kentucky. (Docket No. 34) In 2012, Norfolk suspended and then terminated Gibbs's employment. Gibbs challenges these actions, alleging that Norfolk punished him in retaliation for expressing safety concerns to his supervisor, in violation of the anti-retaliation provisions of the Federal Railroad Safety Act, 49 U.S.C. § 20109. (*Id*.) Norfolk now moves for summary judgment. (D.N. 41) Because Gibbs has failed to demonstrate knowledge on the part of the individuals involved in the decisions to suspend and terminate him, and alternatively because Gibbs fails to show that expressing safety concerns was a contributing factor in their decisions, Gibbs's claim fails as a matter of law. Additionally, because there are no material questions of fact as to either issue, the Court will grant Norfolk's motion for summary judgment.

## I.        Background

At the outset, the Court finds it helpful to outline the Norfolk employees at issue in this matter. Gibbs is a former employee of Norfolk's mechanical department. (D.N. 44-1, PageID # 684–85) While employed with Norfolk, Gibbs worked as a "utility carman," tasked with making expedited repairs on train cars located at the Youngstown Yard in Louisville, Kentucky. (*Id*., PageID # 703) His immediate supervisors at the time of the incident in question were

1

Mechanical Supervisor Charles Crittenden and General Foreman Chris Anderson, the latter of whom made the decision to suspend Gibbs. (D.N. 41-3, PageID # 263) Both men reported to Senior General Foreman Sherrill Jones. (D.N. 41-2, PageID # 250) In turn, Jones's supervisor was Divisional Manager of Mechanical Operations Kevin Krull, based in Knoxville, Tennessee. (*Id.*) Also employed by Norfolk were Mechanical Superintendent Ryan McLain, based in Birmingham, Alabama and who made the decision to terminate Gibbs (*Id.*, PageID # 252), Transportation Department Terminal Superintendent Kraig Barner, and Assistant Trainmaster Scott St. Clair. The latter two men were based in Louisville, Kentucky. (D.N. 44-6, PageID # 884)

On the morning of April 24, 2012, Norfolk Senior General Foreman Sherrill Jones addressed Gibbs and his fellow carmen. Jones informed them that in anticipation of the upcoming Kentucky Derby, Norfolk's "private management entertainment train," which typically arrived at the railyard a week before the Derby, would interfere with employee parking. (*Id.*, PageID # 692) As a consequence of the Derby Train's presence and the fact that their usual entrance was blocked at the time due to municipal utility work, the employees were instructed to park in a separate lot or the surrounding neighborhood. (*Id.*, PageID # 693) Gibbs immediately objected to this instruction because he believed that it would be unsafe to walk from the separate lot to the railyard; he also expressed his concern with parking in the surrounding neighborhood given his concern that it was a high-crime area. (*Id.*, PageID # 693, 720-21) Jones responded that there was nothing he could do about the matter. (*Id.*, PageID # 693) Gibbs then stated his intention to walk to the Derby Train when it arrived to relate his safety concerns to Wick Moorman, Norfolk's Chief Executive Officer. (*Id.*) Jones informed Gibbs that if he did so, he would be arrested for trespassing. (*Id.*, PageID # 695)

Thereafter, Gibbs sent an e-mail to Moorman using Norfolk's intranet page "Ask Wick." The e-mail stated, in its entirety:

> Dear Wick, I am a carman in Louisville, KY. The main entrance that we all use has a water main break and the entrance is blocked off. We are now entering from the other entrance by the control tower and driving through the D-yard area. As you know, this area is blocked off when the Derby train is here. They are telling us that we will have to park away from work and walk in. I said I would walk over to talk to you about it when you got here and show you why we [cannot] enter from the regular entrance and I was told I would be arrested. This came from the senior general foreman here in Louisville. Could you please give me your thought[s] on this issue. It is an inconvenience.

(*Id.*, PageID # 749) In response, Norfolk sent Tennessee-based Division Manager Kevin Krull to Louisville to investigate Gibbs's claim that Jones threatened him. (D.N. 44-3, PageID # 824) Krull interviewed a number of witnesses to the incident, one of whom allegedly told him about the employees' safety concerns. (D.N. 44-4, PageID # 854) At the conclusion of the investigation, Krull asked Gibbs if he wanted Norfolk to initiate disciplinary action against Jones. (*Id.*) In light of Jones's apology and explanation for his initial reaction to Gibbs's demeanor during the meeting, Gibbs declined. (D.N. 41-2, PageID # 258) In the e-mail to his supervisor following the investigation, Krull stated that he had "made it clear to Carman Gibbs that he is welcome to respectfully approach or speak to any [Norfolk] Officer about any concern without apprehension." (*Id.*) Thereafter, Norfolk contacted the city of Louisville regarding the utility repairs. (D.N. 44-3, PageID # 844–45) As a result, the secondary road was opened prior to the Derby Train's arrival, mitigating the parking dilemma. (*Id.*)

On July 26, 2012, three months after the Derby Train incident, Gibbs and his co-worker Chad Quinlin reported to work at the railyard. (D.N. 44-1, PageID # 703) After finishing their morning repairs and with no additional work to complete, Gibbs and Quinlin drove a company truck to a Chick-fil-A restaurant eight miles from the railyard. (*Id.*) There is considerable

dispute over what precipitated this decision. Under the collective-bargaining agreement between Norfolk and its employees, carmen are allowed twenty minutes for lunch. (D.N. 41-3, PageID # 276–77) Additionally, Norfolk's General Regulation 6 states, "Employees must report for duty . . . at the designated time and place . . . [and] must not absent themselves from duty . . . without proper authority." (D.N. 41-9, PageID # 584) Norfolk's "General Rule 1" states, "Vehicles are furnished for handling Company business only. Non-business trips are prohibited." (*Id*., PageID # 594) And Item No. 29 of Norfolk's Senior General Foreman Bulletin 2012-01 states, "Norfolk Southern employees on duty are not to leave the property on business. This includes purchasing or eating meals. When persons are on a road trip, they are certainly permitted to stop and get something to eat." (*Id*., PageID # 593) Notably, the Bulletin lists Senior Foreman Jones as a signatory and Norfolk Mechanical Supervisor—and Gibbs's immediate supervisor—Charles Crittenden among those receiving a courtesy copy. (*Id*.)

Nevertheless, despite these rules, Gibbs maintains that it was "common practice" that once a carman finished his work, he should leave the property and await further orders, pursuant to a quasi "on-call" arrangement. (D.N. 44-1, PageID # 723) Gibbs testified that various Norfolk supervisors had instructed Gibbs on this practice as a way to maintain employee morale, so that workers in the yard did not observe idle co-workers. (*Id*.) Indeed, Gibbs states that he had left the railyard for lunch prior to the day at issue and that his supervisors were aware that he did so. (*Id*., PageID # 725) Quinlin and one additional Norfolk carman testified similarly. (D.N. 44-4, PageID # 860; D.N. 44-8, PageID # 937) Most notably, Gibbs claims that on the day in question, Crittenden told him not to "hang[] around . . . with nothing going on, [and to] go find some place to hide." (D.N. 44-1, PageID # 724)

After spending forty minutes at Chick-fil-A eating lunch, Gibbs and Quinlin drove the Norfolk truck to a secluded area behind a local shopping center, which was the location of Tucker's restaurant. (D.N. 44-1, PageID # 704) Meanwhile, two Norfolk managers, Transportation Department Terminal Superintendent Kraig Barner and Assistant Trainmaster Scott St. Clair, arrived at Tucker's to eat lunch. (D.N. 41-10, PageID # 606) Barner and St. Clair noticed the Norfolk truck idling in the back parking lot. (*Id*.) After spending forty-five minutes eating lunch, Barner and St. Clair, seeing that the Norfolk truck was still idling, decided to investigate. (*Id*., PageID # 610) Barner and St. Clair maintain that prior to approaching the truck, they observed it for fifteen minutes and saw no movement from its occupants. (*Id*., PageID # 611) This led both men to believe that the truck's occupants were sleeping. (D.N. 41-8, PageID # 418) According to Gibbs, however, he and Quinlin simply sat in the truck waiting for their next assignment, as Gibbs had on previous occasions. (D.N. 44-1, PageID # 705)

Barner and St. Clair then approached the vehicle and asked Gibbs and Quinlin to identify themselves. (D.N. 41-10, PageID # 616–17) After learning that both men worked at the Youngstown Yard, Barner told Gibbs that he planned to inform their supervisor of the incident and that they should head back to the railyard. (*Id*., PageID # 619) Because Senior Foreman Jones was on vacation, Barner called Division Manager Krull and reported what he had seen. (*Id*., PageID # 620–21) Krull in turn called General Foreman Chris Anderson, who in the chain of command was above both Crittenden and Gibbs, and discussed what Barner had reported. (D.N. 41-2, PageID # 252)

Meanwhile, Gibbs and Quinlin returned to the railyard, where they spoke with Crittenden and Anderson. (D.N. 44-1, PageID # 708) After interviewing Gibbs and Quinlin, Anderson spoke to Barner and St. Clair concerning the incident. (D.N. 45-2, PageID # 975) Ultimately,

Anderson recommended that Gibbs and Quinlin be held out of service (i.e., suspended) pending a formal investigation. (D.N. 41-2, PageID # 252) Anderson relayed his recommendation to Krull, who agreed with the decision. (*Id*.) Thereafter, Krull appointed Norfolk Mechanical Superintendent Roger McLain, based in Alabama, as the hearing officer for Gibbs's disciplinary proceeding. (*Id*.)

At the proceeding, three union officials represented Gibbs and Quinlin. (D.N. 41-8, PageID # 331) Based on the information presented, McLain concluded that Gibbs and Quinlin had violated three Norfolk rules and that termination of their employment was warranted. (*Id*., PageID # 332) The three violations related to their (1) absenting themselves from duty without authority; (2) unauthorized use of a company vehicle; and (3) sleeping on duty. Gibbs maintains that the proceeding was unfair. (D.N. 44, PageID # 660–61) At the hearing, however, Gibbs admitted to violating the first two rules. (D.N. 41-8, PageID # 435–38) Following his decision, McLain forwarded a copy of the investigation transcript to Norfolk's Labor Relations Department, which agreed with McLain's recommendation. (D.N. 41-11, PageID # 625)

Gibbs and Quinlin then filed appeals through their union to challenge their terminations. The arbitration panel assigned to the appeals affirmed McLain's decision. (*See* D.N. 41-14; D.N. 41-15) Next, Gibbs and Quinlin filed a complaint with the Occupational Safety and Health Administration (OSHA)—a pre-filing requirement under the Federal Railroad Safety Act. (D.N. 34, PageID # 201). Gibbs and Quinlin then filed this action on August 22, 2014, alleging violation of the FRSA's anti-retaliation provision. (D.N. 1) Thereafter, Norfolk moved to dismiss Quinlin's claim against it. (D.N. 10) Meanwhile, Gibbs and Quinlin moved to amend their complaint. (D.N. 18) In a Memorandum Opinion and Order entered on July 14, 2015, the Court dismissed Quinlin's claims under Federal Rule of Civil Procedure 12(b)(6). (D.N. 33)

The Court granted Gibbs leave to amend his complaint, however. (*Id.*; *see also* D.N. 34) Norfolk now moves for summary judgment under Federal Rule of Civil Procedure 56. (D.N. 41)

## II.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may do so by merely showing that the nonmoving party lacks evidence to support an essential element of its case for which it has the burden of proof. *See id.*

If the moving party satisfies this burden, the nonmoving party must point to specific facts in the record demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of its claims. *Celotex Corp.*, 477 U.S. at 323 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"). The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; instead, the nonmoving party must present evidence upon which the jury could reasonably find for it. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Anderson*, 477 U.S. at 252). This "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting

Fed. R. Civ. P. 56(e)). For purposes of a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).

### III. Discussion

Gibbs brings this action pursuant to the FRSA, 49 U.S.C. § 20109, which states that railroad carriers "may not discharge, demote, suspend, reprimand, or in any way discriminate against an employee" for engaging in any protected activities, such as "reporting, in good faith, a hazardous safety or security condition." *Id*. § 20109(b)(1)(A). Gibbs's claim of retaliation under the FRSA is governed by the burden-shifting approach adopted in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, 49 U.S.C. § 42121. Thus, to prevail, Gibbs must show that "(1) he engaged in protected activity; (2) the employer knew that he engaged in protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action." *Consolidated Rail Corp. v. U.S. Dep't of Labor*, 567 F. App'x 334, 337 (6th Cir. May 28, 2014) ("*Conrail*") (citing *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013)). Gibbs bears the initial burden and must show "by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint." 29 C.F.R. § 1982.109(a). The burden then shifts to Norfolk, which must demonstrate "by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity." *Id*. § 1982.109(b).

For the reasons set forth below, the Court finds that Gibbs has failed to present evidence upon which a jury could reasonably find for him on his FRSA claim. *Hartsel*, 87 F.3d at 799.

**a. Protected Activity**

The protected activity at issue here is the good faith reporting of a hazardous safety or security condition. 49 U.S.C. § 20109(b)(1)(A). For purposes of its motion for summary judgment, Norfolk concedes that Gibbs engaged in protected activity when he expressed safety concerns to Jones. (D.N. 41-1, PageID # 236) In his response to Norfolk's motion, Gibbs contends that his April 24, 2012 e-mail to Moorman also qualifies as protected activity. (D.N. 44, PageID # 663) The Court previously concluded that "[n]othing in the e-mail indicates that Gibbs and his coworkers were concerned about their safety; the parking situation is described as merely 'an inconvenience.'" *Gibbs v. Norfolk S. Ry. Co.*, No. 3:14–cv–587–DJH, 2015 WL 4273208, at *4 (W.D. Ky. July 14, 2015). Thus, Gibbs may not rely on the e-mail in establishing his FRSA claim. Gibbs's statement to Jones is the only protected activity at issue.

**b. Unfavorable Action**

For purposes of its motion for summary judgment, Norfolk also concedes that Gibbs suffered an adverse personnel action when he was held out of service and terminated from employment. (D.N. 41-1, PageID # 235) In his response to Norfolk's motion, however, Gibbs asserts three additional unfavorable actions: (i) Jones's alleged threat to have him arrested; (ii) Norfolk's issuance of a rule-violation charge; and (iii) Norfolk's initiation of a disciplinary investigation. (D.N. 44, PageID # 664) Norfolk contends that Gibbs is barred from citing these events as "unfavorable actions."

The Court agrees. Gibbs must show that his protected activity was a contributing factor "in the adverse action *alleged in the complaint*." 29 C.F.R. § 1982.109(a) (emphasis added). Gibbs failed to allege in his complaint the unfavorable actions he now seeks to assert in response to Norfolk's motion for summary judgment. Gibbs "may not amend his complaint through

arguments in his brief in opposition to a motion for summary judgment." *Campbell v. Univ. of Louisville*, 862 F. Supp. 2d 578, 583 (W.D. Ky. 2012) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)).  In the only count of his amended complaint, Gibbs claims that "[Norfolk] took [him] out of service and terminated [him] to retaliate against [him] for [his] protected activity.  These were adverse actions."  (D.N. 34, PageID # 201)  The complaint does not contain even an implicit allegation that Jones's threat was an adverse action.  (*See id.*)  Moreover, any claim premised on Jones's threat would be untimely.  The alleged threat occurred on April 24, 2012.  Gibbs did not file his original complaint with OSHA until December 6, 2012, which is beyond the 180-day limitation period for filing claims under FRSA.  49 U.S.C. § 20109(d)(2)(ii).

Similarly, Gibbs's complaint fails to explicitly allege that the rules-violation charge and the initiation of a disciplinary investigation were adverse actions.  (*See* D.N. 34)  At most, there is an implicit allegation when Gibbs explains that "Anderson made formal charges against [him], and [he was] taken out-of-service . . . pending a formal investigation.  This was an adverse action."  (*Id.*, PageID # 199)  Gibbs's use of "[t]his was" rather than "these were" is telling, however.  It is clear that the complaint refers to Norfolk's action as a single decision, not as three separate decisions (i.e., the charge, the investigation, and the suspension).  The complaint rolls the decisions into one event, which in light of the complaint's later repeated references, clearly refers to Norfolk's suspension of Gibbs.  Gibbs may not amend his complaint through a responsive pleading in order to separate this one event into three separate claims.  *See Campbell*, 862 F. Supp. 2d at 583. In any event, Gibbs's OSHA complaint does not allege that these actions were "adverse actions."  (*See* D.N. 45-1)  Consequently, Gibbs has failed to exhaust the administrative remedies for any claim premised on these actions.  *Foster v. BNSF Ry. Co.*, 866

F.3d 962, 966 (8th Cir. 2017) ("The text of the [FRSA] therefore makes clear that to receive relief . . . litigants must file a complaint with OSHA alleging unlawful discrimination."). Norfolk's suspension and ultimate termination of Gibbs are therefore the only unfavorable actions at issue here.

### c. Employer's Knowledge

As part of his initial burden, Gibbs must show that Norfolk "knew" that he engaged in protected activity. *Conrail*, 567 F. App'x at 337. "The 'knowledge' relevant for a retaliation claim under the FRSA must be tied to the decision-maker *involved* in the unfavorable personnel action." *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 108 (4th Cir. 2016) (emphasis added); *see also Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1115 (8th Cir. 2017) (same). And yet, a "plaintiff is not required to have direct evidence of knowledge and may produce circumstantial evidence to establish this element of her claim." *Conrail*, 567 F. App'x at 338. Gibbs "need not prove that the decision-maker responsible for the adverse action knew of the protected activity if it can be established that those *advising* the decision-maker knew, regardless of their motives." *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB Case No. 11–037, 2013 WL 1385560, at *12 (Dep't of Labor Mar. 29, 2013) (emphasis added).

Norfolk contends that Gibbs has failed to demonstrate that either Anderson—who decided to suspend Gibbs, or McLain who decided to terminate Gibbs—had knowledge of Gibbs's protected activity. (D.N. 41-1, PageID # 236–40; D.N. 45, PageID # 957–60) The undisputed evidence supports this conclusion. In his sworn declaration, McLain states that he had no knowledge of Gibbs's safety complaint prior to his decision to terminate Gibbs. (D.N. 41-8, PageID # 333) In fact, Gibbs admitted during his deposition that he has no reason to believe that McLain had any motivation to retaliate against him. (D.N. 41-3, PageID # 281–82)

Similarly, in his sworn declaration, Anderson states that he first learned of Gibbs's protected activity only after Gibbs and Quinlin filed their OSHA complaint, which was after he made the decision to suspend them. (D.N. 45-2, PageID # 976)  Other facts in the record support this declaration.  Most tellingly, Anderson did not start working at Norfolk Louisville until May 27, 2012—one month following Gibbs's engagement in the protected activity. (D.N. 45-2, PageID # 974) (*See also* D.N. 41-9, PageID # 571–74; D.N. 41-8, PageID # 366–97)

In response, Gibbs presents no evidence to demonstrate that these declarations are suspect.  Rather, Gibbs presents mere speculation that "[g]iven the number of employees [who were present when Gibbs expressed his safety concern] and the fact that Gibbs'[s] complaint reached the very highest levels of [Norfolk] management, it likely was well known through [Norfolk] management." (D.N. 44, PageID # 669)  As already stated, although Gibbs's e-mail unquestionably reached the "highest levels of Norfolk," the e-mail did not contain any reference to a safety concern.  Additionally, the Court declines Gibbs's invitation to infer knowledge on the part of Anderson simply because Crittenden was aware of Gibbs's protected activity and at one point conferred with Anderson regarding the Chick-Fil-A incident. (*See* D.N. 44, PageID # 668)  There is no evidence in the record indicating that Anderson and Crittenden discussed Gibbs's protected activity during their meeting.  In short, Gibbs has not identified a material question of fact regarding Anderson and McLain's knowledge.[1]

Nevertheless, Gibbs presents the theory that even if Anderson and McLain had no knowledge of his protected activity, their decisions were influenced by Krull, who did know about the protected activity and sought to punish Gibbs for it. (D.N. 44, PageID # 666–70)

---

[1] In his response brief, Gibbs states that "[t]here is substantial evidence that Anderson was aware of Gibbs'[s] protected activity when making the decision to suspend him." (D.N. 44, PageID # 668–69)  But Gibbs fails to cite to any part of the record for this generalized contention.

Courts have accepted this so-called "cat's-paw" theory under certain circumstances.[2]  *See Lowery v. CSX Transp., Inc.*, 690 F. App'x 98, 100 (4th Cir. May 26, 2017) (accepting cat's-paw theory where the supervisor "advised" all three decision-makers as to whether the plaintiff had committed a rules violation); *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 970 (8th Cir. 2017) (rejecting cat's-paw theory where the supervisor merely informed his supervisor of the plaintiff's alleged rules violation and arranged for witness interviews); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 790–91 (8th Cir. 2014) (rejecting cat's-paw theory where the supervisor merely participated as a witness at the hearing that led to the plaintiff's discharge and where there was "no evidence [that the supervisor] advised the decision-makers . . . [or] influenced their discharge decision"); *Conrail*, 567 F. App'x at 338 (affirming the ALJ's acceptance of cat's-paw theory where the decision-maker merely reviewed the hearing transcript and had a previous professional relationship with the allegedly biased supervisor).

Here, there is no material question of fact regarding the extent to which Krull participated in the adverse actions.  In his sworn declaration, Krull states that his participation in the investigation was limited to receiving a call from Barner concerning the incident, speaking with Anderson about the information Barner had provided, concurring in Anderson's recommendation to suspend Gibbs, and appointing McLain as the hearing officer at the investigation.  (D.N. 41-2, PageID # 252)  Similarly, Anderson states that "Krull played no part in formulating the charges against Gibbs . . . nor did he play any part in the investigation."  (D.N. 45-2, PageID # 976)  As

---

[2] "The term 'cat's paw' derives from a fable conceived by Aesop . . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n. 1 (2011).  The term was injected into employment-discrimination law in 1990, *see Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), and later into the FRSA context in *Conrail*.  567 F. App'x at 338.

to the dismissal decision, McLain states that he did not consult with or receive any input from Krull regarding his decision.  (D.N. 41-8, PageID # 332)

In response, Gibbs maintains that "Krull was intimately involved in the decision to suspend and charge Gibbs."  (D.N. 44, PageID # 658)  However, the evidence Gibbs cites in support of this contention merely confirms the above declarations and indicates that (i) Krull spoke with Anderson and Barner on July 26, 2012, in order to determine exactly what Barner had seen (D.N. 44-3, PageID # 831); (ii) Anderson called Krull after his interview with Gibbs, and Krull agreed with Anderson's recommendation (D.N. 44-1, PageID # 709); and (iii) Krull sent an e-mail to his supervisor regarding Anderson's decision to suspend Gibbs.  (D.N. 44-3, PageID # 846)  The fact that Krull told Barner that "[he'd] handle it from here" does not indicate that Krull was "intimately" involved in the adverse decisions.  (D.N. 44-6, PageID # 904)  The evidence, when viewed as a whole, shows that Krull's reference to "handling it" simply referred to his plan to confer with Anderson to determine the identity of the employees Barner saw at Tucker's. Contrary to Gibbs's contentions, there is simply no direct or circumstantial evidence to support a jury finding that "Krull actually directed, or [led], Anderson to 'recommend' Gibbs . . . be held out of service and charged," or that "Krull was the major instigator of the charges."[3]  (*Id.*, PageID # 667)  Similarly, Gibbs presents no evidence that Krull was involved in the disciplinary

---

[3] Gibbs claims that "[a]t the investigative hearing, Anderson testified that he had no firsthand knowledge of the events that took place on July 26, 2012, and *based his decision* on information from Krull."  (D.N. 44, PageID # 659 (emphasis added))  But a careful review of the record shows that at no point during the testimony did Anderson expressly state or imply that he "based his decision" on information from Krull.  (*See* D.N. 41-8, PageID # 51)  The record indicates instead that Anderson based his decision on his conversations with Gibbs, Quinlin, Barner, and St. Clair.  (D.N. 44-1, PageID # 708; D.N. 45-2, PageID # 975)  Anderson's statement that he lacked personal knowledge on the issue merely referred to having no knowledge of the event until Krull called him.  (D.N. 41-8, PageID # 388–389)

investigation other than Krull's electing McLain to serve as the hearing officer. There is thus no material question of fact as to the extent of Krull's involvement in the adverse actions.

Based on the extent to which Krull was involved in these actions, Gibbs's cat's-paw theory fails as a matter of law. First, unlike in *Lowery*, where the court accepted the plaintiff's cat's-paw theory, there is no evidence that Krull "advised" Anderson on whether to suspend Gibbs. The unrebutted record clearly indicates that Anderson made the decision on his own after conducting several interviews and consulting Norfolk's employment rules. (D.N. 45-2, PageID # 976) Furthermore, merely concurring in Anderson's recommendation, as Krull did, is not the sort of "advisement" that supports a cat's-paw theory of liability under the FRSA. *See Johnston v. BNSF Ry. Co.*, No. 15–3685 (SRN/KMM), 2017 WL 4685012, at *8 (D. Minn. Oct. 16, 2017) (accepting cat's-paw theory where the supervisors were "intimately involved" in the adverse decision rather than "trivial participants"). Second, as in *Gunderson*, which rejected the plaintiff's cat's-paw theory, the fact that Krull informed his supervisor of Gibbs's alleged rule violations does not constitute intimate involvement. Third, unlike in *Conrail*, which accepted the plaintiff's cat's-paw theory, McLain did more than merely review a hearing transcript in reaching his decision to terminate Gibbs. (D.N. 41-8, PageID # 332) He reviewed and considered the evidence, "including the transcript and exhibits, and [took] into account [his] observation of the witnesses and their testimony." (*Id*.) Ultimately, as in *Kuduk*, which rejected the plaintiff's cat's-paw theory of liability, there is simply no evidence in the record to indicate that Krull advised Anderson or McLain or otherwise influenced them in their decision-making.

The Court therefore finds that Gibbs has failed to demonstrate employer knowledge, and thus his FRSA retaliation claim fails as a matter of law. *Conrail*, 567 F. App'x at 337.

**D. Contributing Factor**

Even if Gibbs had established the requisite knowledge on the part of a decision-maker, he would still need to demonstrate that his protected activity was a contributing factor in his suspension and termination. *Conrail*, 567 F. App'x at 337. Gibbs fails to satisfy this burden and has presented no evidence upon which a reasonable jury could find for him. *Hartsel*, 87 F.3d at 799. "[T]he contributing factor standard has been understood to mean 'any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.'" *Conrail*, 567 F. App'x at 338 (quoting *Araujo*, 708 F.3d at 158); *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013)). Thus, Gibbs "need only show that his protected activity was a 'contributing factor' . . . not the sole or even predominant cause." *Araujo*, 708 F.3d at 158; *see also Palmer v. Canadian Nat'l Ry.*, ARB Case No. 16-035, 2016 WL 5868560, at *31 (Dep't of Labor Sept. 30, 2016) ("The protected activity need only play some role, and even an insignificant or insubstantial role suffices." (internal alterations and quotations omitted)).

Gibbs "can demonstrate that his protected activity was a contributing factor in his employer's adverse employment decision through either direct or circumstantial evidence." *Wagner v. Grand Truck W. R.R.*, No. 15-10635, 2017 WL 733279, at *4 (E.D. Mich. Feb. 24, 2017). Such circumstantial evidence may include

> (i) temporal proximity; (ii) indications of pretext; (iii) inconsistent application of an employer's policies; (iv) shifting explanations for an employer's actions; (v) antagonism or hostility toward a complainant's protected activity; (vi) falsity of an employer's explanation for the adverse action taken; and (v) change in the employer's attitude toward the complainant after he engages in protected activity.

*Id.* (citing *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1101 (D. Minn. 2013)). In addition, the ARB recently held that a factfinder may consider "evidence of an employer's nonretalitory

reasons for its adverse action in determining the contributing-factor question." *Palmer*, 2016 WL 5868560 at *8. Moreover, because Gibbs relies primarily on a cat's-paw theory of liability, he must show that Krull "perform[ed] an act motivated by discriminatory animus . . . [and] that act is a proximate cause of the ultimate employment action." *Kuduk*, 768 F.3d at 790 (internal alteration omitted); *see also Rudolph*, 2013 WL 1647527 at *12 ("[I]f a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action taken, *then* the employer will be held liable." (emphasis added)).

*1. Temporal Proximity*

Gibbs's suspension and termination occurred three and five months, respectively, after he engaged in protected activity. The ARB has found temporal proximity where five to eight months elapsed between the protected activity and the adverse action. *Henderson v. Wheeling & Lake Erie Ry.*, ARB Case No. 11-013, 2012 WL 5391422, at *7–8 (Dep't of Labor Adm. Rev. Bd. Oct. 26, 2012). However, "[i]t is particularly significant at the summary judgment stage that [Gibbs's] protected activity, though close in time, was completely unrelated to [the incident] that led to his discharge . . . . Rather, [the incident] was an intervening event that independently justified adverse disciplinary action." *Kuduk*, 768 F.3d at 792. Here, Gibbs's decision to take a company truck, park it in a secluded area behind a restaurant, and wait for a call, is an intervening event that independently justified adverse action. The Court thus finds that Gibbs may not solely rely on temporal proximity to demonstrate that his protected activity was a contributing factor in Norfolk's decisions to suspend and discharge him.

*2. Disparate Treatment*

The intervening event's relevance is mitigated, however, if Gibbs can show that Norfolk treated him differently than similarly situated individuals. Gibbs has the burden of proving that "the other employee is 'similarly situated in all relevant respects,' including that he or she dealt with the same supervisor, [had] been subject to the same standard, [and] engaged in the same conduct without any mitigating or distinguishing circumstances." *Dafoe v. BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1110 (D. Minn. 2016) (internal citations omitted); *see also Loos*, 865 F.3d at 1114 (stating the plaintiff's burden as demonstrating that his peer was "similarly situated in all relevant respects").

Gibbs points to Norfolk employees who were not suspended or terminated even though they "undisputedly violated the same rule/s as Gibbs, and several with multiple violations." (D.N. 44, PageID # 670) Norfolk argues, however, that "Gibbs'[s] use of the 'rule/s' phraseology is telling." (D.N. 45, PageID # 966) None of the employees Gibbs identified violated all of the same rules at one time, as did Gibbs. (*See* D.N. 44, PageID # 658–59) And Gibbs admitted during his deposition that what he did was not "common practice" and that Crittenden did not give him permission to go to Chick-Fil-A. (D.N. 41-3, PageID # 280; D.N. 41-8, PageID # 434)

The only employee similarly situated to Gibbs is Quinlin. As to Quinlin, Gibbs argues that "[a] jury could very well infer that [Norfolk] was willing to charge and sacrifice Quinlin in order to further its retaliatory plan aimed at Gibbs." (D.N. 44, PageID # 671). As explained below, however, the record offers no evidence indicating a "retaliatory plan" on the part of Norfolk and Krull specifically. Therefore, the Court finds it significant that the only similarly-

situated employee involved in this matter received the exact same punishment as Gibbs, even though Quinlin had not previously engaged in protected activity.

*3. Indications of Pretext/Hostility*

The most significant question in the contributing-factor analysis is whether Gibbs has presented evidence of pretext or hostility on the part of the decision-maker. The Eighth Circuit has held that "[t]he critical inquiry in a pretext analysis is . . . whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Gunderson*, 850 F.3d at 969. *Gunderson* is particularly persuasive given the absence of Sixth Circuit caselaw on this point.

As explained above, Gibbs primarily relies on a cat's-paw theory of liability. That puts Krull's alleged hostility at issue. But Gibbs has failed to demonstrate that Krull held hostile attitudes towards Gibbs or that he agreed with Anderson's recommendation as a mere pretext to punish Gibbs for his protected activity. As evidence of hostility, Gibbs first cites Krull's visit to Louisville on April 25, 2012. When viewing the record as a whole, however, there is no indication that Krull's investigation spawned any hostility on his part. Krull went to Louisville primarily to investigate the threat Jones made to Gibbs. Indeed, Krull has stated that at the time of the investigation, he "was not aware Gibbs had expressed a safety concern." (D.N. 41-2, PageID # 251) Even if Krull had learned of Gibbs's protected activity during the investigation, as Gibbs alleges, there is no indication that Krull left Louisville with a negative opinion of Gibbs. In fact, before he left, Krull informed Gibbs that he was always welcome to approach any Norfolk officer without apprehension. (*Id.*, PageID # 258)

Gibbs next refers to the alleged "common practice" among Norfolk carmen to leave the shipyard for lunch. In light of this "common practice," Gibbs claims that he was punished not

for leaving the railyard on the day in question but rather because of his prior protected activity. Two of Gibbs's fellow carmen testified that they had left the shipyard for lunch prior to the day at issue.[4] (D.N. 44-4, PageID # 860; D.N. 44-8, PageID # 937) Quinlin claimed that he had visited the same Chick-fil-A in a company truck "three to four times" before the day in question. (D.N. 44-8, PageID # 937) But neither employee testified or offered other evidence to support the suggestion that when doing so they also took the Norfolk truck to a secluded area to await instructions or sleep. And though Gibbs claims that his immediate supervisors were aware of this purportedly common practice, he presents no evidence that the Norfolk management involved in this case (i.e., Anderson, Krull, Barner, and St. Clair) condoned it.[5] In fact, it was members of Norfolk management who discovered Gibbs and Quinlin's unauthorized presence at Tucker's.

The unrebutted testimony demonstrates that no Norfolk supervisor gave carmen such as Gibbs permission to leave the shipyard. Quinlin testified, for example, that he had been told by his supervisor to "get lost, be away so people don't see you not working." (D.N. 44-8, PageID # 947) Another employee testified that he had heard Crittenden tell carmen to be "out of sight, out of mind," which he understood to mean "[i]f you finish your work, just hang out and wait for a call." (D.N. 44-4, PageID # 855, 861) Neither alleged quote from Norfolk supervision establishes, however, that the employees were allowed to leave company property, in a company

---

[4] Gibbs also cites a letter allegedly signed by Norfolk employees on August 17, 2012. (D.N. 44, PageID # 655) The letter states that "local [Norfolk] supervision" informed employees that it would be okay for one individual to leave the shipyard and get food for the entire crew. (*Id.*) Because this alleged decision by Norfolk occurred after the incident at issue, it is irrelevant to Gibbs's claim. Additionally, although Gibbs cites an instance in which employees allegedly left the shipyard once to pick up food for a cookout, he could not identify who, if anyone, authorized the action. (D.N. 44-1, PageID # 735)

[5] Instead, the evidence suggests a more innocent explanation for why Gibbs was punished while others who had taken company trucks to lunch had not: he was caught by members of management.

vehicle, for nearly an hour. Rather, Gibbs admitted that no Norfolk employee gave him permission to leave the railyard on the day at issue or to take a company truck to lunch off site. (D.N. 41-3, PageID # 277)

Ultimately, Gibbs's own strategy reveals the lack of pretext in this case. In Gibbs's response brief, he argues that McLain's investigation was a sham because Anderson had an ulterior motive to terminate Gibbs for his protected activity. (D.N. 44, PageID # 669) When confronted with the fact that Krull, not Anderson, chose McLain to act as the hearing officer and that Anderson has sworn that he had no knowledge about Gibbs's protected activity at the time he suspended him, Gibbs changed his theory to argue in his sur-reply that it was Krull who had the ulterior motive and was the mastermind. (*See* D.N. 46-1) In the end, Gibbs simply fails to show that Norfolk's investigation into the Chick-fil-A incident was mere pretext to punish Gibbs for his prior protected activity. Rather, the unrebutted evidence demonstrates that Norfolk suspended and terminated Gibbs because he violated Norfolk's rules. The Court need not review the merits or fairness of Norfolk's employment decisions because "federal courts do not sit as a super-personnel department that re-examines an employer's disciplinary decisions." *Kuduk*, 768 F.3d at 792 (quotation omitted). "[I]f the discipline was wholly unrelated to protected activity," as it is here, "whether it was fairly imposed is not relevant to the FRSA causal analysis." *Id.*; *see also Trimmer v. Dep't of Labor*, 174 F.3d 1098, 1104 (10th Cir. 1999) (explaining that whistle-blower protection laws "are not . . . intended to be used by employees to shield themselves from the consequences of their own misconduct or failures").

The Court concludes that Gibbs has failed to demonstrate that his protected activity was a contributing factor in Norfolk's decisions to suspend and terminate him, and his FRSA retaliation claim fails for this additional reason.

**E. Rebuttal Defense by Clear and Convincing Evidence**

Because Gibbs has failed to establish a prima facie case of retaliation, the Court need not consider whether Norfolk would have taken the same adverse action in the absence of any protected activity. *Conrail*, 567 F. App'x at 337.

## IV.     Conclusion

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Norfolk's motion for summary judgment (D.N. 41) is **GRANTED**.

(2)     A separate judgment will be entered this date.

March 28, 2018

**David J. Hale, Judge**
**United States District Court**